STREEKS, INC., APPELLEE AND CROSS-APPELLANT, V. DIAMOND HILL FARMS, INC., A NEBRASKA CORPORATION, APPELLEE, AND JOHN D. NIELSEN, ALSO KNOWN AS JACK NIELSEN, APPELLANT AND CROSS-APPELLEE.

605 N.W.2d 110

Filed January 21, 2000. No. S-98-396.

Laurice M. Margheim, of Curtiss, Moravek, Curtiss & Margheim, for appellant.

Robert G. Pahlke and Maren Lynn Chaloupka, of The Van Steenberg Firm, for appellee Streeks, Inc.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

HENDRY, C.J.

## I. INTRODUCTION

Darrel Streeks, doing business as Streeks, Inc., brought an action against John D. Nielsen for fraudulent concealment based on Nielsen's failure to disclose certain information about potato seed. A jury rendered a verdict in favor of Streeks, Inc., in the amount of $25,000. Nielsen filed a notice of appeal and a petition to bypass. Streeks, Inc., cross-appealed. We granted Nielsen's petition to bypass, see Neb. Rev. Stat. § 24-1106(2) (Reissue 1995), and now affirm.

## II. BACKGROUND

Streeks, Inc. (Streeks), is a family corporation composed of Darrel Streeks and his wife, LeAnn Streeks. Nielsen, doing business as Diamond Hill Farms, Inc., is in the business of raising seed potatoes for his own use and for sale to other farmers. For a number of years, Streeks has been engaged in growing certified seed potatoes. Potato growing in Nebraska is a specialized area of farming, with only 16 certified potato growers in the state.

Since 1994, Streeks has grown certified seed potatoes for Frenchman Valley Produce, which is owned and operated by Timothy May, Streeks' brother-in-law. May grows commercial potatoes and had agreements with Streeks in 1994 through 1996

to supply seed for this purpose. Pursuant to their agreement, during each of the 3 years, May would purchase potato seed and sell it to Streeks. Streeks would then raise the seedling potatoes at his expense and sell them back to May at a specified price. May then used the seedling potatoes to grow a commercial potato crop. This arrangement guaranteed May the required seedlings at a certain price.

May's operation requires a supply of seedling potatoes of a certain quality. The quality of certified potatoes is determined by classifying them into "generations." The generation of potato seed is determined by the standards set forth by the Potato Certification Association of Nebraska. One of the factors that determines a potato's generational level is the percentages of certain diseases it contains. Generation I potatoes have the lowest percentage of allowable diseases, and Generation V potatoes have the highest. Seed is evaluated by the "Florida winter test," which tests the seed for viruses. Seed can be reclassified at a lower generational level if the Florida tests detect a virus content that is above the acceptable level for that generation. Seed at one generational level produces a potato classified at the next lower generational level. May produced Generation III or IV potatoes, which required Generation II or III potato seed.

In early December 1995, Streeks contacted May and asked May to locate a supplier of Generation II seed for Streeks' use in raising the 1996 crop of Generation III seedlings for May. May located the supplier because May is a larger grower who could obtain a better price on the seed. May learned that Nielsen had some Generation II seed available for sale and contacted Nielsen about purchasing a supply. Before signing a written contract for the purchase of the seed, May informed Nielsen that Streeks would be raising the seedlings. Nielsen was aware that this was a three-party transaction in which May purchased the seed from Nielsen for Streeks' use in raising Generation III seedlings for May.

In January 1996, May entered into a contract with Nielsen for the purchase of Generation II certified seed. The contract contained a limitation-of-damages provision and an exclusion of warranties, including any warranties that the seed was free of latent potato diseases. After entering into the contract with

Nielsen, May and Nielsen had no further contact with one another regarding the seed. May told Streeks that Nielsen would be supplying the seed that Streeks would raise for May. All further communication regarding the seed was between Streeks and Nielsen.

In early February 1996, Nielsen learned that the results of the Florida tests, dated January 31, 1996, showed the seed had been downgraded from Generation II to the lowest generational level, Generation V, because it contained 3.2 percent leaf roll virus. The allowable percentage of leaf roll virus for Generation II seed is two-tenths of a percent. Nielsen did not inform May or Streeks that the seed had been downgraded.

In March 1996, May and Streeks reduced to writing their agreement regarding the seed May had purchased from Nielsen in January. Streeks purchased the Generation II seed from May for $25,300 and agreed to plant the seed to raise Generation III seedlings for May. May agreed to purchase the seedlings Streeks raised for $6.50 per hundredweight.

Nielsen was aware that Streeks was going to pick up the seed. Streeks and Nielsen spoke on the telephone on several occasions prior to Streeks' picking up the seed. Streeks and Nielsen discussed the fact that the seed was supposed to be classified as Generation II and would be used to raise certified seedlings for May. Streeks claimed that during these conversations, Nielsen never told him the seed had been downgraded to Generation V and never mentioned any problem with leaf roll. Nielsen claimed he told Streeks that the seed was "loused up with leaf roll" when he spoke with Streeks on the telephone in mid-April 1996. It is undisputed in the record that Nielsen never told Streeks that the seed had been downgraded. Only Nielsen knew that the seed had been downgraded.

On May 2, 1996, Streeks picked up the seed from Nielsen's storage Quonset and began planting later that same day, believing the seed to be classified as Generation II. After Streeks had planted the seed in early May, Nielsen informed Streeks that the seed was carrying leaf roll virus. According to Streeks, this was the first indication that the seed was not classified as Generation II. Both parties acknowledged that Streeks reacted with shock and surprise when Nielsen revealed this information.

Because the seed was classified as Generation V, instead of Generation II, Streeks could not meet the requirement under his contract with May to supply Generation III seedlings. Nielsen never requested payment from May for the seed.

Streeks was unable to sell much of his crop as seedlings because it was too early in the year to sell that type of seedling potatoes. Furthermore, a nationwide surplus of potatoes made it difficult to sell the crop as commercial potatoes. Streeks did sell some of the potatoes, but at much lower prices than originally provided for under the contract with May.

On April 8, 1997, Streeks filed an action in Banner County District Court against Nielsen based on negligence, fraudulent misrepresentation, and fraudulent concealment. The negligence and fraudulent misrepresentation claims were disposed of prior to trial. Streeks claimed approximately $152,322 in damages as the result of not being able to sell the seedlings to May at the specified price under their contract. Streeks claimed that Nielsen fraudulently concealed the fact that the seed Streeks received had been downgraded from Generation II to Generation V.

The fraudulent concealment claim was tried to a jury on January 26 through 30, 1998. At trial, Nielsen admitted that reclassification of seed is a material fact important to the grower of certified seedlings and that it is an accepted practice in the industry to disclose any reclassification. Nielsen admitted that there is an obligation to disclose a reclassification and that it would never be appropriate to fail to disclose such a fact.

Both parties moved for directed verdicts, and both motions were overruled. The jury found in favor of Streeks in the amount of $25,000. Streeks filed a motion for new trial or for judgment notwithstanding the verdict on the issue of damages only, claiming that the verdict was too small and was not supported by the evidence. The motion was denied. Nielsen thereafter appealed, and Streeks cross-appealed.

## III. ASSIGNMENTS OF ERROR

Nielsen claims, rephrased, that the trial court erred in (1) denying his motion for summary judgment because Nielsen owed no duty to inform Streeks of the reclassification of the seed, (2) denying his motion for directed verdict because

Nielsen owed no duty to inform Streeks of the reclassification of the seed, (3) not deciding the issue of duty to disclose as a matter of law, (4) incorrectly instructing the jury on the issue of duty to disclose, (5) refusing to give his proposed "benefit of the bargain" instruction on damages, (6) incorrectly instructing the jury on the issue of damages, (7) not allowing the contract between Nielsen and May into evidence, and (8) ruling that his contract defenses were inapplicable.

In the cross-appeal, Streeks claims the trial court erred in (1) overruling Streeks' motion for new trial or for judgment notwithstanding the verdict because the amount of damages awarded was not supported by the evidence, (2) refusing to grant Streeks' motion for directed verdict on the issue of mitigation of damages, and (3) giving an instruction on the issue of mitigation.

## IV. STANDARD OF REVIEW

■ On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999).

■ Jury instructions are subject to the harmless error rule, and an erroneous jury instruction requires reversal only if the error adversely affects the substantial rights of the complaining party. *Corcoran v. Lovercheck*, 256 Neb. 936, 594 N.W.2d 615 (1999).

■ In determining the admissibility of evidence, the exercise of judicial discretion is implicit in determinations of relevancy and admissibility, and the trial court's decision will not be reversed absent an abuse of discretion. *Seeber v. Howlette*, 255 Neb. 561, 586 N.W.2d 445 (1998).

■ A motion for new trial is addressed to the discretion of the trial court, whose decision will be upheld in the absence of an abuse of that discretion. *Nguyen v. Rezac*, 256 Neb. 458, 590 N.W.2d 375 (1999). "A civil jury verdict will not be disturbed on appeal unless clearly wrong." *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 182, 459 N.W.2d 718, 727 (1990). The amount of damages to be awarded will not be disturbed on appeal if it is supported by evidence and bears a reasonable rela-

tionship to the elements of the damages proved. *Jones v. Meyer*, 256 Neb. 947, 594 N.W.2d 610 (1999).

## V. ANALYSIS

### 1. FRAUDULENT CONCEALMENT

#### (a) Summary Judgment

Nielsen claims that the trial court erred in not granting his motion for summary judgment. However, because the denial of Nielsen's motion for summary judgment is, under the circumstances presented, not reviewable on appeal, Nielsen's assignment of error on that ground is without merit. See *Doe v. Zedek*, 255 Neb. 963, 587 N.W.2d 885 (1999).

#### (b) Directed Verdict

■ Nielsen contends the trial court incorrectly denied his motion for directed verdict. When a motion for directed verdict made at the close of all the evidence is overruled by the trial court, appellate review is controlled by the rule that a directed verdict is proper only where reasonable minds cannot differ and can draw but one conclusion from the evidence, and the issues should be decided as a matter of law. *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996). Nielsen claims his motion for directed verdict should have been granted because he had no duty to disclose to Streeks that the seed had been downgraded. He claims there was no contractual, fiduciary, or other special relationship between the parties that would create a duty to disclose. However, Streeks claims that Nielsen did have a duty to disclose because of the three-party transaction involving May, Nielsen, and Streeks. Thus, the issue presented is whether Nielsen owed Streeks a duty to disclose and the parameters of such a duty.

As an initial clarification, we note that the elements of fraudulent concealment include a showing by the plaintiff that the defendant had a duty to disclose. In several fraudulent concealment cases involving vendor-purchaser relationships, we have not mentioned duty to disclose as a specific element of a fraudulent concealment claim. See, *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994); *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990); *Nelson v. Cheney*, 224 Neb.

756, 401 N.W.2d 472 (1987). However, in these "vendor-purchaser" cases, the contractual relationship between vendor and purchaser creates the duty to disclose. The duty to disclose was assumed as an element of a fraudulent concealment claim in that context.

 Because Streeks' claim falls outside the vendor-purchaser context, we must look to other cases where we have discussed fraudulent concealment. In *In re Estate of Stephenson*, 243 Neb. 890, 503 N.W.2d 540 (1993), a wife sought to rescind an antenuptial agreement based on her husband's failure to disclose material facts about his financial position. Regarding fraudulent concealment, we stated that

> to prove fraudulent concealment, a plaintiff must show that (1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment.

243 Neb. at 899, 503 N.W.2d at 547. In *In re Estate of Stephenson*, we specifically included duty to disclose as an element of fraudulent concealment. We further noted, " '[W]here one has a duty to speak, but deliberately remains silent, his silence is equivalent to a false representation.' " *Id.* at 898-99, 503 N.W.2d at 547, quoting *State ex rel. NSBA v. Douglas*, 227 Neb. 1, 416 N.W.2d 515 (1987). But see *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993) (duty not stated as specific element of fraudulent concealment).

We determine that *In re Estate of Stephenson* properly sets out the elements of fraudulent concealment. In order to recover against Nielsen, Streeks must show that Nielsen owed him a duty to disclose the fact that the seed had been downgraded. However, the question remains as to what type of relationship will give rise to such a duty.

■ In nondisclosure cases, the law does not attempt to define occasions when the duty to speak arises, but, instead, has adopted the proposition that whether a duty to speak exists is determined by all the circumstances of the case. 37 Am. Jur. 2d *Fraud and Deceit* § 146 (1968). Although the circumstances of each case typically determine whether a duty to disclose exists, there are several situations which have been consistently recognized as creating a duty to disclose. Such situations have been summarized in Restatement (Second) of Torts § 551 at 119 (1977) as follows:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

(a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust or confidence between them; and

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and

(c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and

(d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and

(e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

The elements listed in § 551 on the creation of a duty to disclose have been widely used. See, e.g., *Chiarella v. United States*, 445 U.S. 222, 100 S. Ct. 1108, 63 L. Ed. 2d 348 (1980), citing the Restatement, *supra*, § 551(2)(a); *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153 (3d Cir. 1993), citing the Restatement, *supra*, § 551; *Midwest Commerce Banking v. Elkhart City Centre*, 4 F.3d 521 (7th Cir. 1993), citing the Restatement, *supra*, § 551(2)(e); *Cent. States Stamping v. Terminal Equip. Co.*, 727 F.2d 1405 (6th Cir. 1984), citing the Restatement, *supra*, § 551(1) and (2); *Blon v. Bank One, Akron, N.A.*, 35 Ohio St. 3d 98, 519 N.E.2d 363 (1988), citing the Restatement, *supra*, § 551; *Saint Alphonsus Med. Center v. Krueger*, 124 Idaho 501, 861 P.2d 71 (Idaho App. 1992), citing the Restatement, *supra*, § 551(2); *In re Williams*, 314 Or. 530, 840 P.2d 1280 (1992); *Bernstein v. Portland Sav. and Loan*, 850 S.W.2d 694 (Tex. App. 1993), *disapproved on other grounds, Crown Life Ins. Co. v. Casteel*, No. 98-0218, 1999 WL 450773 (Tex. July 1, 1999). Furthermore, in *Bank of Valley v. Mattson*, 215 Neb. 596, 339 N.W.2d 923 (1983), we cited § 551 on the creation of a duty as helpful in resolving the issue in that case.

Nielsen correctly points out that in *Citizens Nat. Bank of Wisner v. Kennedy & Coe*, 232 Neb. 477, 441 N.W.2d 180 (1989), an accounting malpractice case, we refused to apply Restatement (Second) of Torts § 551 (1977). However, the issue in *Citizens Nat. Bank of Wisner* was the accountants' negligence, not fraudulent concealment. Because *Citizens Nat. Bank of Wisner* involved negligence, not fraud, § 551 was properly disregarded.

Contrary to Nielsen's contention, recognizing a duty to disclose in this case would not constitute an improper extension of the duty we have recognized in professional malpractice cases. The duty discussed in these malpractice cases is based on negligence, not fraud. See, *Tess v. Lawyers Title Ins. Corp.*, 251 Neb. 501, 557 N.W.2d 696 (1997); *Lawyer's Title Ins. Corp. v. Hoffman*, 245 Neb. 507, 513 N.W.2d 521 (1994); *St. Paul Fire & Marine Ins. Co. v. Touche Ross & Co.*, 244 Neb. 408, 507 N.W.2d 275 (1993); *Citizens Nat. Bank of Wisner v. Kennedy & Coe, supra*; *Landrigan v. Nelson*, 227 Neb. 835, 420 N.W.2d 313 (1988); *Lilyhorn v. Dier*, 214 Neb. 728, 335 N.W.2d 554

(1983); *Ames Bank v. Hahn*, 205 Neb. 353, 287 N.W.2d 687 (1980).

The duty involved in a case asserting negligence is different than the duty involved in a case asserting fraud. For example, in *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 371, 518 N.W.2d 910, 921 (1994), we noted the difference between fraudulent misrepresentation and negligent misrepresentation, stating:

> [T]he difference between fraudulent misrepresentation and negligent misrepresentation is the duty required in each claim. In fraudulent misrepresentation, one becomes liable for breaching the general duty of good faith or honesty. However, in a claim of negligent misrepresentation, one may become liable even though acting honestly and in good faith if one fails to exercise the level of care required under the circumstances.

In *Gibb*, we adopted Restatement (Second) of Torts § 552 (1977) to specifically enumerate the elements of *negligent misrepresentation*. In the present case, § 551 properly sets out when a duty to disclose may arise in a claim of *fraudulent concealment*.

Under the Restatement, *supra*, § 551, a duty to disclose may arise among parties to a business transaction. The term "business transaction" is not defined in § 551. Generally, a transaction consists of " 'an act or agreement, or several acts or agreements having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered. It is a broader term than "contract." ' " *Transamerica Commercial Finance v. Naef*, 842 P.2d 539, 542 (Wyo. 1992). See, also, *United States Hoffman Machinery Corp. v. Ebenstein*, 150 Kan. 790, 96 P.2d 661 (1939); *Sylvester v. Evans*, 109 Ohio App. 211, 160 N.E.2d 142 (1959); *Miles v. Starks*, 590 S.W.2d 223 (Tex. Civ. App. 1979). The term "transaction" has also been defined as "[a]ny activity involving **two or more persons**." (Emphasis supplied.) Black's Law Dictionary 1503 (7th ed. 1999).

In the present case, Streeks, May, and Nielsen were parties to a business transaction involving potato seed. May and Streeks agreed that May would procure the seed for Streeks' use in growing seedlings for May. May's contract with Nielsen for the

purchase of the seed would not have occurred had there been no agreement with Streeks to raise the seedlings. When May first contacted Nielsen, he informed Nielsen that Streeks would be raising the seedlings. Thereafter, Streeks and Nielsen communicated directly with one another regarding the seed. Although there was not a contract between Streeks and Nielsen; Streeks, May, and Nielsen were all parties to this specialized business transaction involving potato seed.

Existence of a contract between the plaintiff and the defendant is not necessary for a duty of disclosure to arise. In *R.A. Peck, Inc. v. Liberty Fed. Sav. Bk.*, 108 N.M. 84, 766 P.2d 928 (N.M. App. 1988), a bank entered into a loan agreement with a bank customer for construction of a ski lodge. The customer then entered into a contract with a contractor to build the ski lodge. Before beginning construction, the contractor received assurance from the bank that the loan for the project had been funded. The bank knew that the contractor was relying on the loan funds for payment of its construction services. The bank told the contractor to submit all its bills directly to the bank for payment and had numerous conversations with the contractor regarding payment for the contractor's services. Thereafter, the bank improperly disbursed all of the loan funds to other parties outside the purposes of the loan agreement, without disclosing this to the contractor. The contractor was left with $350,000 of unpaid work on the project. The court held that the bank had a duty to disclose to the contractor the premature disbursement of all the funds even though there was no contract between the bank and the contractor.

We have permitted an action for fraudulent concealment in a situation regarding a business transaction where there was no contract between the plaintiff and the defendant. In *Wilson v. Misko*, 244 Neb. 526, 508 N.W.2d 238 (1993), the defendant encouraged the plaintiffs to invest in an oil exploration venture. The plaintiffs thought the defendant had himself invested in the venture, when in fact he had not. The defendant later received a portion of the broker's commission as a result of convincing the plaintiffs to invest. We determined that the plaintiffs were entitled to a jury instruction on fraudulent concealment.

■ Under Restatement (Second) of Torts § 551(2)(e) (1977), Nielsen had a duty to disclose the reclassification of the seed potatoes to Streeks. Section 551(2)(e) states that a party to a business transaction has a duty to disclose facts basic to the transaction when he or she knows another party is about to enter into the transaction under a mistake as to those facts and that the other party would reasonably expect a disclosure of those facts because of the relationship between the parties, the customs of the trade, or other objective circumstances.

Nielsen and Streeks were parties to the transaction involving the potato seed. Nielsen knew that it was basic to the transaction that the seed be classified as Generation II. Nielsen spoke to Streeks on several occasions after Nielsen knew that the seed had been downgraded, but before the seed was picked up. Nielsen did not disclose the fact that the seed had been downgraded to Generation V. Streeks planted the seed, mistakenly believing it was classified as Generation II. Streeks would not have picked up the seed and planted it had he known the seed was not classified as Generation II. Nielsen admitted that it is standard practice in the industry to disclose any reclassification of seed and that it would never be appropriate to fail to disclose such information. The transaction involving Streeks, May, and Nielsen; the customs of the potato trade; and the objective circumstances of the case make it reasonable for Streeks to expect Nielsen to disclose to him the fact that the seed had been downgraded. The trial court correctly denied Nielsen's motion for directed verdict because under the Restatement, *supra*, § 551(2)(e), Nielsen owed Streeks a duty to disclose the reclassification.

(c) Jury Instruction on Duty to Disclose

■ Nielsen also claims that the trial court erred in not deciding the issue of duty as a matter of law. We have stated that the question of whether a legal duty exists is a question of law dependent on the facts in a particular situation. See *Doe v. Gunny's Ltd. Partnership*, 256 Neb. 653, 593 N.W.2d 284 (1999). In fraudulent concealment cases, existence of a duty to disclose is a question of law, but the breach of that duty is a question of fact for the jury. See, *Berger v. Security Pacific Inf.*

*Systems*, 795 P.2d 1380 (Colo. App. 1990); *Maack v. Resource Design & Const., Inc.*, 875 P.2d 570 (Utah App. 1994); *DeBry v. Valley Mortg. Co.*, 835 P.2d 1000 (Utah App. 1992).

The record in this case shows that the court decided the issue of whether a duty to disclose existed as a matter of law. Prior to trial, Nielsen made a motion for summary judgment, which was denied as to the fraudulent concealment claim. Furthermore, Nielsen made a motion for directed verdict at the close of Streeks' evidence, and that motion was denied. The court, in ruling on the motion for summary judgment and motion for directed verdict, decided that Streeks had shown a duty to disclose. Had the court determined there was no duty to disclose, Nielsen would have prevailed. This assignment of error is without merit.

Nielsen also asserts that instruction No. 10 was an incorrect statement of the law. Instruction No. 10 paraphrases Restatement (Second) of Torts § 551(2)(e) (1977) as it relates to the element of duty in a fraudulent concealment claim. We have determined that § 551(2)(e) is a correct statement of the law. The jury needed to understand the duty Nielsen owed to Streeks in order to determine whether the facts demonstrated that Nielsen breached that duty by not disclosing to Streeks that the seed had been downgraded. The jury was properly instructed that a party to a business transaction has a duty to disclose facts basic to the transaction when the other party would reasonably expect a disclosure. Thus, this assignment of error is without merit.

All the jury instructions read together and taken as a whole correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence. Thus, there is no prejudicial error necessitating a reversal. See *Doe v. Gunny's Ltd. Partnership, supra.*

## 2. DAMAGES INSTRUCTION

(a) Benefit of Bargain Measure of Damages

Nielsen claims the trial court erred by failing to give Nielsen's proposed instruction on the measure of damages using the "benefit of the bargain" rule. To establish reversible error from a court's failure to give a requested instruction, an appellant has the burden of showing that (1) the tendered instruction

is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's failure to give the tendered instruction. *Doe v. Gunny's Ltd. Partnership*, 256 Neb. 653, 593 N.W.2d 284 (1999). Nielsen's proposed instruction stated the measure of damages as the difference between the value of the seed Streeks expected to receive and the value of the seed actually received at the time of delivery.

The benefit of the bargain rule is an appropriate measure of damages when the fraud induces a party to enter a contract for sale of property. See, *Bibow v. Gerrard*, 209 Neb. 10, 306 N.W.2d 148 (1981); *Camfield v. Olsen*, 183 Neb. 739, 164 N.W.2d 431 (1969); *Beveridge v. Miller-Binder, Inc.*, 177 Neb. 734, 131 N.W.2d 155 (1964); *Rothery v. Pounds*, 150 Neb. 25, 33 N.W.2d 347 (1948); *Falkner v. Sacks Bros.*, 149 Neb. 121, 30 N.W.2d 572 (1948).

However, in the present case, we are not presented with a situation in which Streeks was fraudulently induced to enter into a contract with Nielsen. Because this action is not based on a fraudulently induced contract, the benefit of the bargain rule is not the appropriate measure of damages.

Nielsen has failed to show that his proposed benefit of the bargain instruction is a correct statement of the law warranted by the evidence in this case. Thus, failure to give this proposed instruction is not reversible error.

(b) Damages Instruction Given by Trial Court

Nielsen further claims that the trial court erred by giving instruction No. 11, which Nielsen claims allowed the jury to speculate on the issue of damages. Instruction No. 11 defined damages as the difference between the value to Streeks of the seed crop at maturity had the seed been suitable and the value of the actual crop received at harvest, less any savings, plus added expenses.

The instruction given by the court was an appropriate measure of damages under the circumstances of this case. "In an action for fraud a party may recover such damages as will compensate him for the loss or injury actually caused by the fraud and place the defrauded party in the same position as he would

have been in had the fraud not occurred." *Forker Solar, Inc. v. Knoblauch*, 224 Neb. 143, 154, 396 N.W.2d 273, 281 (1986). See, also, *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). Because of Nielsen's nondisclosure, Streeks could not perform the contract with May and was damaged as a result. Instruction No. 11 correctly states the law, was not misleading, and was supported by the pleadings and the evidence. Thus, there is no prejudicial error necessitating reversal. See *Doe v. Gunny's Ltd. Partnership, supra.*

### 3. MAY-NIELSEN CONTRACT

Nielsen also claims that the trial court erred in refusing to receive the January 1996 contract between May and Nielsen (May-Nielsen contract) into evidence, thus preventing Nielsen from asserting the contractual exclusions of warranty and limitation-of-damages provisions as defenses against Streeks' fraud claim. The court excluded the contract as irrelevant and did not allow Nielsen to assert his contract defenses.

The May-Nielsen contract included exclusion of warranty provisions and limited damages to the price of the seed. Nielsen claims that Streeks should have no better rights against him than May would have had under the contract. However, Nielsen overlooks the fact that had May sued Nielsen, the May-Nielsen contract would not have prohibited May from bringing a separate claim for fraudulent concealment.

We have held that a purchaser is not limited to the contract when bringing claims against a seller, but may also bring claims for fraudulent concealment, fraudulent misrepresentation, and negligence. In *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994), the purchaser of a house brought an action against the seller for fraudulent concealment of termite damage. The selling agent showed the purchaser one area of termite damage, but failed to disclose the fact that other areas of the house contained termite damage. The purchaser sued the seller for fraudulent concealment, fraudulent misrepresentation, negligence, and breach of contract. The seller attempted to assert an "as is" clause contained in the sales contract as a defense against the purchaser's fraudulent concealment claim. We held that the "as is" clause contained in the con-

tract did not bar the purchaser's fraud-based claim and that thus, the purchaser was allowed to proceed on all four theories of recovery.

Although *Gibb* involved a sale of realty rather than a sale of goods governed by the Nebraska Uniform Commercial Code, the reasoning applied in *Gibb* is applicable to the situation in the present case. Nebraska's U.C.C. does not preclude an action for fraud. Neb. U.C.C. § 1-103 (Reissue 1992) provides: "Unless displaced by the particular provisions of the Uniform Commercial Code, the principles of law and equity, including . . . *fraud*, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions." (Emphasis supplied.)

A similar result was reached in *Murray v. D & J Motor Co., Inc.*, 958 P.2d 823, 831 (Okla. App. 1998), where the Oklahoma Court of Appeals stated, "Fraud and deceit provide a ground for recovery that is independent of contract or UCC." Furthermore, disclaimer of warranties is not material to a fraud action. *Id.* Thus, the May-Nielsen contract provisions do not insulate Nielsen from a claim of fraud.

Additionally, the disclaimer in the May-Nielsen contract provided that there were "no warranties which extend beyond the description on the face hereof." However, the face of the contract stated, and Nielsen expressly warranted, that the seed was classified as Generation II. Thus, had May sued Nielsen, the disclaimer of warranties would have had no effect and Nielsen would also be liable to May under the U.C.C. for supplying May with Generation V seed, which was not the seed for which May had contracted.

Streeks' cause of action is a tort claim based on fraud perpetrated by Nielsen. Streeks is not asserting any additional or better claim than that which would have been available to May. The trial court did not abuse its discretion in excluding the May-Nielsen contract as irrelevant. We find that based on the circumstances of this case, Nielsen's contract defenses were inapplicable against Streeks' fraud claim.

We find that Nielsen has asserted no error requiring reversal in this case. We now turn to Streeks' cross-appeal.

## 4. Cross-Appeal

### (a) Insufficiency of Jury Verdict

Streeks' first assignment of error is that the amount of damages awarded was so low that the trial court erred in overruling Streeks' motion for new trial or for judgment notwithstanding the verdict.

"A civil jury verdict will not be disturbed on appeal unless clearly wrong." *Chadron Energy Corp. v. First Nat. Bank*, 236 Neb. 173, 182, 459 N.W.2d 718, 727 (1990). "The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved." *Jones v. Meyer*, 256 Neb. 947, 950, 594 N.W.2d 610, 612 (1999).

The jury verdict in this case was not clearly wrong. The jury awarded Streeks $25,000, which is approximately the amount Streeks paid May for the seed. The potatoes Streeks raised were still suitable for sale in other markets at a lower price. Streeks did not sell the potatoes immediately after harvest, but held them, hoping for an increase in price, which never materialized. A mitigation of damages instruction allowed the jury to reduce Streeks' damages by any amount that he could have received had he sold the potatoes sooner. Although the evidence could have supported a larger verdict, the amount awarded is not clearly wrong under all the evidence presented. Thus, the trial court did not abuse its discretion by denying Streeks' motion for new trial. See *Nguyen v. Rezac*, 256 Neb. 458, 590 N.W.2d 375 (1999).

### (b) Mitigation of Damages

Finally, Streeks claims that the trial court erred in not granting a directed verdict on the issue of mitigation of damages and in instructing on mitigation. Streeks claims there was insufficient evidence to support such an instruction.

A litigant is entitled to have the jury instructed only upon those theories of the case which are presented by the pleadings and which are supported by competent evidence. *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997). Submission of an issue on which the evidence is insufficient to

sustain an affirmative finding is generally prejudicial and results in a new trial. *Id.*

■ The burden is on the defendant to prove that the plaintiff should have taken some action to mitigate damages. *Hurlbut v. Landgren*, 200 Neb. 413, 264 N.W.2d 174 (1978). An instruction on mitigation can be properly denied when the defendant produces no evidence on the issue of mitigation. *Id.*

Nielsen produced evidence that Streeks could have done more to mitigate his damages by selling his crop as commercial potatoes earlier in the season or by marketing them through a larger grower. Because Nielsen produced some evidence that Streeks failed to mitigate his damages, the motion for directed verdict on the issue of mitigation was properly denied and the instruction on mitigation was warranted by the evidence. See, *Traphagan v. Mid-America Traffic Marking*, 251 Neb. 143, 555 N.W.2d 778 (1996); *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997).

## VI. CONCLUSION

Having considered all assignments of error of both parties and finding them to be without merit, the judgment of the district court is affirmed.

AFFIRMED.