KEVIN ORD ET AL., APPELLANTS, V.
AMFIRST INVESTMENT SERVICES ET AL., APPELLEES.

704 N.W.2d 796

Filed October 11, 2005.    Nos. A-04-153, A-04-437.

Ronald D. Mousel, of Mousel & Garner, and Mark J. Appleton, of Robinson, Waters & O'Dorisio, P.C., for appellants.

G. Peter Burger, of Burger & Bennett, P.C., and James M. Bausch, Shawn D. Renner, and Andre R. Barry, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellees AmFirst Bank and Van Korell.

J. Bryant Brooks, of Brooks Law Offices, P.C., and Richard M. Grant for appellees DynaCorp Financial Strategies, Inc., DFS Credit Corporation, and Robert Vener.

INBODY, Chief Judge, and CARLSON and MOORE, Judges.

CARLSON, Judge.

## INTRODUCTION

Kevin Ord; Ord, Inc.; D&J Trust; and Dan Liebig, as trustee of D&J Trust (collectively the plaintiffs), appeal from orders of the district court for Red Willow County dismissing certain of the plaintiffs' claims against AmFirst Bank; AmFirst Investment Services; Kent Carter; Van Korell; Aragon Financial Services, Inc. (Aragon); DynaCorp Financial Strategies, Inc. (DynaCorp); DFS Credit Corporation (DFS); DFS Secured Healthcare Receivables Trusts II and IV; Robert Vener; Bank of New York Western Trust Company; Chiao, Smith & Associates; and Buchanan, Anderson and Pratt. This case involves the plaintiffs' purchase of notes issued by DFS trusts through Carter, a registered representative of Aragon, from June 11, 1997, through January 25, 2000, and DFS' subsequent default on these obligations. For the reasons set forth below, we affirm in part, and in part reverse and remand with directions.

## BACKGROUND

Beginning in 1993, Korell, president of AmFirst Bank, began discussions with Carter and Aragon's predecessor concerning the possibility of generating income for the bank through the sale of securities. Shortly thereafter, an agreement was reached in which Carter agreed to lease space from the bank and sell investments through his company, which Carter called AmFirst Investment Services.

The record shows that upon that agreement, AmFirst Bank advertised that it had a "[n]ew [d]ivision at AmFirst Bank, AmFirst Investment Services. . . . Please make an appointment to visit with Kent Carter or any of our officers concerning this new service. AmFirst . . . second to none."

Under that agreement, AmFirst Bank received 40 to 42½ percent of each dollar of fees and compensation earned by AmFirst Investment Services, with Aragon receiving 15 to 20 percent and Carter receiving the remaining 40 to 42½ percent.

The lease agreement between Carter and AmFirst Bank specifically stated that Carter was to remain an independent contractor, but other evidence on this record suggests that Carter was an employee of AmFirst Bank. Specifically, there is evidence

that Carter's office was inside AmFirst Bank and that AmFirst Investment Services had no separate signage. Additionally, the record shows that a vice president of AmFirst Bank was supervising Carter and that AmFirst Bank had the power to approve or disapprove any investment product sold by Carter.

Furthermore, the record shows that Carter was allowed to participate in AmFirst Bank's group health insurance plan for its employees, that AmFirst Bank paid for half of Carter's health insurance costs, and that AmFirst Bank provided Carter with part-time clerical help from one of its own employees.

In 1995 or 1996, DFS notes issued by DFS trusts appeared on Aragon's approved products list. The trusts were purportedly established by and affiliated with DFS, DynaCorp, and Vener. On July 9, 1997, Ord, acting as president and on behalf of Ord, Inc., purchased two DFS notes through Carter—one for $120,000 and another for $40,000. Liebig, acting as trustee for D&J Trust, also purchased DFS notes in the following amounts on the following dates: $62,000 on June 11, 1997; $75,000 on January 16, 1998; $50,000 on May 4, 1998; $25,000 on May 15, 1998; and $38,000 on January 25, 2000, for a total of $250,000.

On November 15, 2000, after DFS had defaulted on its obligations regarding the DFS trusts, both Ord and Liebig met separately with representatives of Aragon, including Carter, in the basement of AmFirst Bank. During those meetings, Ord and Liebig each signed a copy of a document entitled "Assignment and Hold Harmless Agreement." With regard to the assignment, each agreement stated: "Investor hereby assigns and conveys to Aragon all of its rights and interests in and to any and all claims or causes of action or other rights of recovery associated with its investment in the Securities ('Claims')." In exchange, Aragon agreed that at its expense, it would "use commercially reasonable efforts to pursue the Claims of Investor . . . against DFS and/or DFS-Related Parties."

With respect to the hold harmless portion, each agreement states:

> Investor hereby agrees, on behalf of itself and all who may claim through it, to release and hold the Released Parties (as hereinafter defined) harmless from and against all claims, causes of action, debts, liabilities, obligations or expenses,

of any nature, that arise out of or in any way relate to the offer and/or sale of the Securities, whether asserted in a court of law, arbitration or mediation and regardless of whether known by Investor or otherwise.

Each agreement further provides that for purposes of the agreement,

"Released Parties" means and includes Aragon and each and every past and present director, officer, shareholder, employee, representative, broker, dealer, agent, affiliate, subsidiary, parent company and insurer of Aragon, including without limitation each and every bank or other financial institution with which Aragon contracted, or which participated or acted together with Aragon, in any capacity, in connection with the offer and/or sale of the Securities.

On June 8, 2001, the plaintiffs filed suit against the various defendants. In the petition, the plaintiffs asserted 15 "Claims for Relief" against AmFirst Bank, Carter, and Aragon as follows: (1) violation of the Securities Act of Nebraska, Neb. Rev. Stat. § 8-1101 et seq. (Reissue 1997, Cum. Supp. 2000 & Supp. 2001), specifically § 8-1102(b), by misrepresentation; (2) violation of the Securities Act of Nebraska, specifically § 8-1102(b), by omission; (3) common-law negligence, by misrepresentation; (4) common-law negligence, by omission; (5) common-law breach of fiduciary duty; (6) investment advisers as fiduciaries; (7) common-law fraud, by misrepresentation; (8) common-law fraud, by omission; (9) breach of contract; (10) violation of broker-dealer registration provisions under § 8-1103 and 15 U.S.C. § 78*o* (2000); (11) violation of investment adviser registration provisions under § 8-1103 and 15 U.S.C. § 80b-3 (2000); (12) violation of securities registration provisions under § 8-1104 and 15 U.S.C. § 77e (2000); (13) violation of the Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301 et seq. (Reissue 1999); (14) common-law agency; and (15) control person liability. The plaintiffs also asserted the allegation of control person liability against Korell.

The plaintiffs asserted claims of accounting and common-law fraud against DynaCorp, DFS, the DFS trusts, and Vener. Additionally, the plaintiffs asserted claims of accounting and common-law negligence, aiding and abetting, breach of fiduciary

duty, and common-law fraud against Bank of New York Western Trust Company; Chiao, Smith & Associates; and Buchanan, Anderson and Pratt. Although the plaintiffs originally sought punitive and exemplary damages, they later dropped that claim. The plaintiffs requested costs, expenses, "pre- and post-judgment interest," reasonable attorney fees, and "such other and further relief as to this Court seems just and proper."

On April 22, 2002, the plaintiffs filed with the district court a motion to compel production of documents and answer interrogatories. The issue presented by the motion to compel was whether Carter, AmFirst Bank, Korell, and Aragon should be required to provide the plaintiffs with the names of other persons to whom Carter had sold investments in the DFS trusts.

On May 10, 2002, AmFirst Bank, Carter, and Korell filed a written objection to the plaintiffs' request, contending that providing the plaintiffs such information would not lead to the discovery of admissible evidence and that the disclosure of such information would violate the confidentiality provisions of Neb. Rev. Stat. § 8-1401 (Cum. Supp. 2000). On July 10, the district court entered an order nunc pro tunc denying the plaintiffs' motion to compel.

On September 19, 2002, the plaintiffs filed a motion for summary judgment on their 12th claim for relief against Carter and Aragon for the sale of unregistered securities. Carter and Aragon raised the issue of the assignment and hold harmless agreement. The district court denied the plaintiffs' motion, stating that the assignment and hold harmless agreement signed by the plaintiffs generated genuine issues of material fact.

On June 5, 2003, AmFirst Bank, Carter, and Korell filed for leave to amend their answer, stating that amending their answer would allow them to assert three additional affirmative defenses: statutes of limitations, contributory negligence or assumption of risk, and estoppel. On July 1, the trial court granted this motion.

On July 24, 2003, AmFirst Bank, Carter, and Korell filed a motion for summary judgment. On September 22, the plaintiffs filed a motion for reconsideration of their previously denied motion for summary judgment. On September 23, the plaintiffs filed a motion for summary judgment on their 12th claim for relief against AmFirst Bank for the sale of unregistered securities.

In an order filed January 5, 2004, the trial court granted AmFirst Bank, Carter, and Korell's motion for summary judgment and denied the plaintiffs' motion for reconsideration of their summary judgment motion and their summary judgment motion against AmFirst Bank on the plaintiffs' 12th claim. In overruling the plaintiffs' motion for summary judgment, the trial court stated that "there are still issues of material fact with regard to the effect of the Assignment and Hold Harmless Agreement entered into by the Plaintiffs and the Defendants."

In granting AmFirst Bank, Carter, and Korell's motion for summary judgment, the court stated that the assignment and hold harmless agreement is a valid contract and that such agreement clearly shows that the plaintiffs are no longer the real parties in interest, having assigned their interests to Aragon. The trial court also found that by signing the agreement, the plaintiffs released AmFirst Bank and Korell from any liability.

The court further stated that the facts clearly show that the plaintiffs' federal claims under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Adviser's Act of 1940 were all filed after the 1-year statute of limitations and the 3-year statute of repose. The court further found that under the federal law, there is no tolling of the 3-year statute of repose, either legal or equitable, except for Liebig's January 25, 2000, purchase.

Subsequently, the trial court dismissed Carter from the action, given that the U.S. Bankruptcy Court for the District of Nebraska had entered a discharge against him, and the court then scheduled a new trial date for the remaining defendants. The record also shows that Bank of New York Western Trust Company was dismissed, given that it had reached a settlement with the plaintiffs. The plaintiffs then moved for a default judgment against DynaCorp, DFS, DFS Secured Healthcare Receivables Trusts II and IV, and Vener (hereinafter collectively DFS defendants), and Aragon for failure to respond to discovery. DFS defendants filed a motion for summary judgment.

On March 5, 2004, the trial court denied the plaintiffs' motion to enter default judgment except as against Aragon. The trial court entered a default judgment against Aragon and in favor of both Ord for $160,413.86 plus interest at 3.016 percent per

annum and Liebig for $280,213.04 plus interest at the same rate. The trial court granted DFS defendants' motion for summary judgment, stating that the assignment and hold harmless agreement signed by the plaintiffs dictated the dismissal of the plaintiffs' claims against these defendants.

The plaintiffs appeal.

## ASSIGNMENTS OF ERROR

On appeal, the plaintiffs contend that the district court erred in (1) granting the defendants' motions for summary judgment and holding that there are no genuine issues of fact regarding the assignment and hold harmless agreement, the application of the various statutes of limitation, and the apparent authority of Carter as an agent for AmFirst Bank; (2) failing to grant the plaintiffs' motion for summary judgment against certain defendants on the plaintiffs' 12th claim for relief for the sale of unregistered securities; (3) failing to allow the plaintiffs to question other AmFirst Bank customers as to falsification of their DFS subscription documents, their nonaccredited investor status, and other misrepresentations by the defendants; and (4) allowing AmFirst Bank to amend its answer and raise, for the first time, statutes of limitation as an affirmative defense.

## STANDARD OF REVIEW

■ In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Spring Valley IV Joint Venture v. Nebraska State Bank*, 269 Neb. 82, 690 N.W.2d 778 (2005); *Plowman v. Pratt*, 268 Neb. 466, 684 N.W.2d 28 (2004).

■ When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court. *Blue Cross and Blue Shield v. Dailey*, 268 Neb. 733, 687 N.W.2d 689 (2004).

## ANALYSIS

*Motions for Summary Judgment.*

On appeal, the plaintiffs contend that the district court erred in granting the defendants' motions for summary judgment and

holding that there are no genuine issues of fact regarding the assignment and hold harmless agreement, the application of the various statutes of limitation, and the apparent authority of Carter as an agent for AmFirst Bank. The plaintiffs also contend that the trial court erred in failing to grant the plaintiffs' motion for summary judgment against certain defendants on the plaintiffs' 12th claim for relief for the sale of unregistered securities.

Initially, we note that in our reading of the court's order, the court did not make specific findings in regard to Carter's authority as an agent for AmFirst Bank, and therefore, we will not address this assignment in determining whether the court erred in granting certain defendants' motions for summary judgment. Rather, we focus on the trial court's two bases for the entry of summary judgment—the assignment and hold harmless agreement and the applicable statute of limitations.

Because the party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists, that party must therefore produce enough evidence to demonstrate his or her entitlement to judgment if the evidence remains uncontroverted. *Schafersman v. Agland Coop*, 268 Neb. 138, 681 N.W.2d 47 (2004). Once the party moving for summary judgment produces enough evidence to demonstrate his or her entitlement to judgment if the evidence remains uncontroverted, the burden of producing contrary evidence shifts to the party opposing the motion. *Id.*

In regard to the assignment and hold harmless agreement, the trial court made conflicting findings. In overruling the plaintiffs' motion for summary judgment, the court found that genuine issues of material fact existed regarding the agreement, while in granting certain defendants' motions for summary judgment, the trial court clearly found that no genuine issues of material fact existed. We find that genuine issues of material fact do exist regarding the assignment and hold harmless agreement. Therefore, on that basis, the trial court was correct in denying the plaintiffs' motion for summary judgment but erred in granting certain defendants' motions for summary judgment.

On appeal, the plaintiffs contend that they were fraudulently induced to sign the assignment and hold harmless agreement, given that Aragon representatives and Carter concealed the fact

that Carter himself, on behalf of Aragon and AmFirst Bank, may have been guilty of wrongdoing.

Specifically, Ord stated in his deposition that he invested in "DFS Receivables" through Carter all $160,000 of Ord's retirement funds because Carter stated that these investments were safe and secure and would preserve Ord's principal. Liebig also testified that he told Carter that his objective was a safe, secure, low-risk investment and that Carter assured him that the DFS investments met those objectives and were guaranteed by the federal government.

Both Ord and Liebig stated that Carter never gave them a prospectus for the DFS investments. Additionally, Ord testified that it was not until after the plaintiffs filed their lawsuit that he found out that the DFS investments involved a high degree of risk, according to the private placement memorandum for each DFS trust.

Additionally, both Ord and Liebig testified that at the time the assignment and hold harmless agreements were signed, neither of them was aware that the DFS investments were unregistered securities which could be sold only to "accredited investors," including individuals or entities with high income and high net worth. Both Ord and Liebig stated that they did not meet the requirements to be considered accredited investors and when shown the subscription documents stating that they met these requirements, both Ord and Liebig stated that they had never provided Carter with such information. In Carter's deposition, he denied that he had falsified any of the information regarding the plaintiffs' incomes and net worth and stated that the information he put down for the plaintiffs was information the plaintiffs gave him.

In addition to the plaintiffs' testimony regarding their own investments, they produced affidavits from two other individuals who also invested in DFS notes through Carter. In these affidavits, both individuals stated that they did not meet the specific income and net worth requirements to invest in DFS notes.

Both Ord and Liebig stated that at their individual meetings with Aragon and Carter after DFS' default on its obligations, Aragon indicated that there had been wrongdoing on the part of

entities other than Aragon but made no mention of any wrongdoing by Carter.

Fraud may consist in words, acts, or the suppression of material facts with the intent to mislead and deceive. *Peter v. Peter*, 262 Neb. 1017, 637 N.W.2d 865 (2002).

To prove fraudulent concealment, a plaintiff must show that (1) the defendant had a duty to disclose a material fact; (2) the defendant, with knowledge of the material fact, concealed the fact; (3) the material fact was not within the plaintiff's reasonably diligent attention, observation, and judgment; (4) the defendant concealed the fact with the intention that the plaintiff act in response to the concealment or suppression; (5) the plaintiff, reasonably relying on the fact or facts as the plaintiff believed them to be as the result of the concealment, acted or withheld action; and (6) the plaintiff was damaged by the plaintiff's action or inaction in response to the concealment. *Streeks v. Diamond Hill Farms*, 258 Neb. 581, 605 N.W.2d 110 (2000).

Clearly, the record before us shows that genuine issues of material fact exist as to the following: whether Aragon and Carter concealed material facts with the intent that the plaintiffs acted in response to this concealment; whether the plaintiffs relied on the facts as the plaintiffs believed the facts to be as the result of the concealment; and whether the plaintiffs were damaged as the result of their reliance. AmFirst Bank argues, though, that no genuine issue of material fact exists as to whether Aragon and Carter had a duty to disclose those material facts. Specifically, AmFirst contends that "Neither Aragon nor Carter owed [the plaintiffs] a fiduciary duty to disclose information after the specific transactions [purchase of notes] were complete." Brief for appellees AmFirst Bank and Korell at 20.

Where one has a duty to speak, but deliberately remains silent, his or her silence is equivalent to a false representation. *Streeks, supra*. In nondisclosure cases, the law does not attempt to define occasions when the duty to speak arises, but, instead, has adopted the proposition that whether a duty to speak exists is determined by all the circumstances of the case. *Id.*

Under the circumstances of the instant case, we cannot adopt AmFirst Bank's conclusion that Aragon and Carter had no duty to disclose material facts to the plaintiffs. Clearly, even though

the sale of the notes was complete, Aragon and Carter had an ongoing duty to the plaintiffs, given that Aragon and Carter promised to undertake the responsibility of assisting the plaintiffs with recovering their money and impressed upon the plaintiffs that their signing of the release and the hold harmless agreement was imperative to the success of such recovery. Based on these circumstances, Aragon and Carter clearly had a continuing duty to the plaintiffs which included the duty not to conceal material facts.

■ In fraudulent concealment cases, existence of a duty to disclose is a question of law, but the breach of that duty is a question of fact for the jury. *Id.* Given our finding above that genuine issues of material fact exist, including whether Aragon and Carter breached their duty, we conclude that these issues of material fact precluded the entry of summary judgment in favor of the defendants. Given that genuine issues of material fact exist regarding whether the plaintiffs were fraudulently induced to sign the hold harmless agreement, the trial court did not err in denying the plaintiffs' motion for summary judgment on this ground. We note that AmFirst Bank remains a defendant in this action, given that genuine issues of material fact exist as to whether Carter was AmFirst Bank's employee.

In regard to the relevant statute of limitations, the trial court found that the plaintiffs' federal claims under the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Adviser's Act of 1940 were all filed after the 1-year statute of limitations and the 3-year statute of repose.

The record shows that the plaintiffs' 10th claim for relief, under the Securities Exchange Act of 1934, alleges a violation of 15 U.S.C. § 78*o*; that the plaintiffs' 11th claim for relief alleges violations of 15 U.S.C § 80b-3; and that the plaintiffs' 12th claim for relief, under the Securities Act of 1933, alleges a violation of 15 U.S.C. § 77e. The defendants argued, and the court found, that § 13 of the Securities Act, 15 U.S.C. § 77m, applies to all three of the above claims. Section 77m provides as follows:

> No action shall be maintained to enforce any liability created under section 77k or 77*l*(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should

have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 77*l*(a)(1) of this title, unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 77k or 77*l*(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77*l*(a)(2) of this title more than three years after the sale.

The 1-year statute of limitations in § 77m runs from the date each "violation" occurred. See *Caviness v. Derand Resources Corp.*, 983 F.2d 1295 (4th Cir. 1993). A violation of § 77e occurs when a person sells an unregistered, nonexempt security. See 15 U.S.C § 77*l*(a)(1). A violation of § 78*o* occurs when an unregistered broker sells a security. A violation of § 80b-3 occurs when an unregistered investment adviser first enters into an agreement to provide investment adviser services. See *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992). The record shows that Carter sold DFS notes to the plaintiffs more than 1 year prior to the filing of the plaintiffs' complaints.

The plaintiffs contend that the district court should have tolled the statute of limitations to take into consideration that the plaintiffs did not learn of Carter's alleged misconduct and DFS' default until on or about June 15, 2000.

Under § 77m, there is no equitable tolling for failure to register claims, given that registration is a matter of public record and therefore claims alleging the sale of unregistered securities cannot be concealed. See *Perry H. Bacon Trust v. Transition Partners, Ltd.*, 298 F. Supp. 2d 1182 (D. Kan. 2004).

The trial court found that the statute of repose could not be tolled under federal law, except for Liebig's January 25, 2000, purchase, which was the only purchase by Ord or Liebig occurring within 3 years of the filing of the plaintiffs' petition on June 8, 2001. On this record, we cannot find that the trial court erred in its determination.

## *Opportunity to Question Other AmFirst Bank Customers.*

The plaintiffs also argue that the trial court erred in failing to allow them to question other individuals who had purchased DFS

notes through Carter as to falsification of their DFS subscription documents, their nonaccredited investor status, and other misrepresentations by Carter evidencing motive, intent, plan, identity or scheme, or absence of mistake or accident, pursuant Neb. Rev. Stat. § 27-404(2) (Reissue 1995).

■ The party asserting error in a discovery ruling bears the burden of showing that the ruling was an abuse of discretion. *In re Interest of R.R.*, 239 Neb. 250, 475 N.W.2d 518 (1991).

Specifically, in the plaintiffs' motions to compel, they requested that the court require Carter, AmFirst Bank, Korell, and Aragon to identify all other individuals or entities who invested in DFS notes through Carter. The plaintiffs stated that at a hearing, all of the individuals could then be questioned about whether the information on their investment applications was accurate, whether they were in fact " 'accredited investors,' " whether they were provided with DFS offering or risk disclosure documents by Carter, and what Carter verbally told them as to the safety and conservative nature of such investments.

AmFirst Bank, Korell, and Carter objected to the plaintiffs' request for discovery, citing § 8-1401, which allows a bank to withhold customer information it deems confidential without

> a court order of a court of competent jurisdiction setting forth the exact nature and limits of such required disclosure and a showing that all persons or organizations to be affected by such order have had reasonable notice and an opportunity to be heard upon the merits of such order.

AmFirst Bank, Korell, and Carter also stated that the plaintiffs' requests were beyond the scope of Neb. Ct. R. of Discovery 26 (rev. 2001) and that the plaintiffs were requesting dissemination of privileged, nonpublic, confidential customer information unrelated to the plaintiffs' litigation.

Under rule 26(b)(1),

> [p]arties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and

location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The trial court denied the plaintiffs' motions to compel, stating that the information requested by the plaintiffs relates only to third parties not involved in this lawsuit and that the requested information would not lead to admissible evidence. On this record, we cannot say that the trial court abused its discretion in denying the plaintiffs' motions to compel.

*AmFirst Bank's Amendment to Its Answer.*

The plaintiffs also argue that the trial court erred in allowing AmFirst Bank to amend its answer and raise statutes of limitation as a defense. Specifically, the plaintiffs contend that AmFirst Bank's amendment of its answer occurred many years after the original answer was filed, years after the last discovery was taken on the issue, well after the pleadings had been ordered closed, and without good cause shown.

The decision whether to allow or deny an amendment to any pleading lies within the discretion of the court to which application is made. *Genthon v. Kratville*, 270 Neb. 74, 701 N.W.2d 334 (2005); *New Light Co. v. Wells Fargo Alarm Servs.*, 252 Neb. 958, 567 N.W.2d 777 (1997). See, also, Neb. Rev. Stat. § 25-852 (Reissue 1995) (statute applicable to this action because action was filed prior to statute's repeal by 2002 Neb. Laws, L.B. 876, operative January 1, 2003; amended pleadings are now governed by Neb. Ct. R. of Pldg. in Civ. Actions 15 (rev. 2003)). Although the decision whether to allow or deny an amendment to any pleading lies within the discretion of the court to which application is made, the statute is to be liberally construed and amendments are permitted where they are proposed at an opportune time and will be in the furtherance of justice. *Genthon, supra*; *New Light Co., supra*.

AmFirst Bank contends that their amendment comported with Nebraska law, given that they proposed their amended answer nearly 3 months before the trial was originally scheduled to take place and nearly 6 months before the summary judgment hearing

actually occurred. The trial court agreed with AmFirst Bank, stating that AmFirst Bank's amendment of its answer was in furtherance of justice and did not prejudice the plaintiffs, given that there were more than 90 days before the commencement of trial. On this record, we cannot say that the trial court abused its discretion.

## CONCLUSION

After reviewing the record, we conclude that the trial court erred in granting the defendants' motions for summary judgment, because there are genuine issues of fact regarding the assignment and hold harmless agreement. The trial court did not err in failing to grant the plaintiffs' motion for summary judgment or in finding that the plaintiffs' 10th, 11th, and 12th claims under federal law are barred by the relevant statute of limitations, except for Liebig's January 25, 2000, purchase of DFS notes. Additionally, the trial court did not err in failing to allow the plaintiffs to question other AmFirst Bank customers or in allowing AmFirst Bank to amend its answer and raise, for the first time, statutes of limitation as an affirmative defense. For these reasons, we reverse in part, and remand with directions for the trial court to dismiss its entry of summary judgment and for further proceedings consistent with this opinion. All other orders of the trial court are affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.